Baldwin, J.
The merits of this cause turn upon the force and effect of the deed of the 3d of March 1831, by which the defendant Gantt and his wife conveyed to the defendant Kennerly certain real estate, of which the wife was the fee simple owner. There is no substance, *294 I think, in the objection taken to the certificate by the justices of the privy examination of the feme. They certify that she was examined “ separately and out of the hearing of her husband.” This I consider equivalent to the words used in the form given by the statute, “privily and apart from her husband.”
The effect of this deed was, in the contemplation of a Court of Equity, to convert the property thereby conveyed from realty into personalty. It is well settled that land directed or agreed to be sold and turned into money, (upon the principle that what is agreed or ought to be done is considered as done,) shall be treated as immediately assuming the quality of personalty, and as continuing impressed with that character, until some person entitled to the proceeds shall elect to take the subject in its- original character of land. In this ease, the purposes of the conveyance to the trustee are declared to be, that he may sell the lands for the best price he can get therefor, for the use and benefit of the party of the first part, (meaning the grantors Gantt and his wife,) and to enable him the trustee to- make good and sufficient deeds to the purchaser or purchasers. The obvious intent of the instrument was to divest the title of the feme, and vest it in the trustee, in order to effect sales of the property, from time to time, and place the proceeds at the disposal of the grantors.
The subject of the deed was thus converted from realty into personalty, and in its new character the equitable right to it was conferred upon the husband and wife jointly. The husband thereby acquired the power to alien or incumber it without the concurrence of the wife, and in the event (which has happened) of his surviving her, the whole interest, so far as undisposed of by him, became his absolute property. This is unquestionable upon principle, and the case of Collingwood v. Wallis, 1 Equ. Cas. Abr. 395, is directly in point, as regards the right of the surviving husband.
*295 In that case, husband and wife, with intent to raise money to pay husband’s debts, and other debts charged on wife’s estate, by lease and release and fine, conveyed wife’s real estate to trustees, to sell and dispose thereof for payment of the debts; and any balance in the trustees’ hands to be paid to the husband and wife, as they should by writing direct or appoint. The trustees sold all the lands, except two farms in A., and paid all the debts. The wife died in the lifetime of the husband, leaving a daughter, issue of the marriage. The husband devises his lands in A. to his brother; leaving no other lands but the two farms, which remained unsold after his death; and bequeaths to his bastard children a surplus of money from the sales which had been made: thus disinheriting the legitimate daughter of himself and wife; who claimed the two farms as heir of her mother. The Lord Chancellor decreed the trustees to convey the unsold lands to the devisee of the husband ; saying that the trustees having the power to sell the whole, it must be considered in equity as if actually sold, in which case the money would go to the husband ,• and so must the land too, else it would be in the power of the trustees to make it land or make it money at their pleasure, and so give it to whom they should think fit: but the intention appearing [from the nature of the case] that the residue should go to the husband and wife and the survivor of them, it must go accordingly, whether land or money.
In the case before us, the conversion of the subject from realty into personalty, is decisive against the pretension of the defendant Norborne Beall Gantt, claiming as the heir at law of Mrs. Gantt, his mother. The Chancellor supposes that there was an equity of redemption in Mrs. Gantt, which descended to her heir; but this, it seems to me, cannot be so. The whole of her right, title and interest in the subject was divested by the deed to the trustee, and the change thereby effected *296 in the character of the property; which has passed to her surviving husband, and those entitled under him, to the total exclusion of her representatives.
The only possible ground upon which the claim of Mrs. Gantt’s heir at law could be sustained, is a reconversion of the property from personalty into realty, by the exercise of some election (of course made subsequently to the deed of March 1831,) to hold the subject as land instead of money. But there was no such election, at least none which could have the eifect of reinvesting Mrs. Gantt with any title to the property. If it should be supposed that the mortgage of the 28th of April 1831, executed by Gantt and wife to Mrs. M’Clanachan, is evidence of an election to waive a sale of the property by the trustee under the deed of March 1831, and hold the subject as realty; inasmuch as it conveys the same to the mortgagee as land, and provides for its redemption, or foreclosure and sale, as if it were real estate ; I answer that I deem it unnecessary to enquire into the correctness of that suggestion. If the giving of the incumbrance to secure a debt of the husband, (the form of which is unobjectionable, whether the property thereby conveyed was supposed to be realty or personalty,) could be considered an election to hold it as land instead of money; still the election would not be that of the wife, who during the coverture had no power so to elect. Pratt v. Taliaferro, 3 Leigh 419. The election would be that of the husband, he having complete control and dominion over the subject, and would enure to his sole benefit; unless shewn to have been made for himself and his wife jointly; and in that case the result would be, not a remitter of the wife to her former estate in the land, but a transmutation of their joint interest in the personalty to a joint estate in the realty. They would thus be constituted joint owners of the land, but not joint tenants; and the estate would devolve upon the survivor, for each would have the entirety, and there *297 could be no partition between them. Thornton v. Thornton, 3 Rand. 179.
In no point of view, therefore, has the heir at law of Mrs. Gantt shewn any title, legal or equitable, to the subject in controversy. And this brings us to the consideration of the rights of the other parties claiming under the surviving husband.
The deed of March 1831, to the trustee Kennerly, having impressed upon the property the character of personalty, it follows necessarily that the husband, at least while it continued impressed with that character, had the perfect power to alien or incumber it without the concurrence of the wife. It cannot be pretended that any thing occurred to remove the impression so received, between the date of that deed and the mortgage to Mrs. M ’ Clanachan made within two months thereafter. It was therefore wholly unnecessary for the wife to unite in that mortgage. Her doing so could not affect its validity as the act of her husband ; and consequently the objections which have been taken to the certificate by the justices of her privy examination require no consideration. Nor can it be supposed that the mortgage is less effectual because it does not notice the new character impressed upon the land thereby conveyed. It was still land, and properly described as such, though impressed with the character of personalty; and the instrument embraced all the right and title of the mortgagor in and to the subject, of whatever nature that may have been in the contemplation of a Court of Equity.
Thus it will be seen that the attitude of Mrs. M’ Clanachan, one of the defendants, is that of an incumbrancer, under a mortgage duly executed to her, by the legitimate owner of the property, to secure a just debt: and the question is, whether her rights are subordinate to those of Siler, Price Sf Co. the plaintiffs in the cause.
*298 Siter, Price Co. in the first place, claim under a mortgage, dated the 13th of June 1829, executed by Gantt and wife to the defendant Kennerly, to secure a debt due to him from Gantt by bond. But this incumbrance was subject to a prior mortgage executed by Gantt and wife to the defendants Byers Sf Butler and others, to secure debts due from Gantt to them respectively. There are sufficient funds within the control of the Court, produced by sales of parts of the mortgaged premises, to discharge the sums due upon the two incumbrances ; and an appropriation of those funds, so far as requisite, to that object, has been made by the decree of the Chancellor. The mortgages may therefore be considered as having been paid off. Still, however, a question arises whether the plaintiffs can tack to Kennerly’s mortgage other claims derived from him, but not secured by that incumbrance. These claims consist of Gantt’s promissory note to Maginnis for 150 dollars, due the 10th of March 1831, assigned to Kennerly; Gantt and Blackwell’s negotiable note to Kennerly for 3612 dollars 96 cents, dated the 5th of June 1831; and Kennerly’s open account against Gantt, for 3524 dollars 44 cents, incurred between the 1st of January 1831, and the 24th of March 1832.
The English doctrine of tacking, in the cases to which it is applicable, prevents a mortgage from being redeemed or discharged, without the payment also of other debts contracted by the mortgagor to the mortgagee ; and subjects an intermediate incumbrancer to the necessity of paying off a lien subsequent to his own, as the condition of redeeming a mortgage prior to both. When the doctrine is applicable, it is in favour of an elder mortgagee, holding another debt not secured by the mortgage; or of a junior mortgagee, who has advanced his money, without notice at the time of an intermediate incumbrance, and afterwards purchases in a prior mortgage, in order to protect himself against the mesne incumbrance, though then having notice thereof.
*299 Upon the first branch of this doctrine, the early cases held, that if the mortgagee was also the creditor of the mortgagor by bond, the latter could not redeem without paying off the bond as well as the mortgage. This was required of him as a supposed equitable condition : but in truth it had no just foundation in equity. The mortgagor when he conveyed away his land, did so with the reservation of a right to redeem, by paying the debt which was the consideration of the contract; and to impose another condition not contemplated by the parties, instead of leaving the creditor to his personal remedy, was an unjust and oppressive exaction. Later decisions have restrained the rule to narrower limits, within which it is now placed upon a different principle. The mortgagee is no longer permitted to tack his bond debt as against the mortgagor himself, or a subsequent incumbrancer, nor as against other creditors over whom he is not otherwise entitled to priority; but he may tack as against the heir of the mortgagor, or a beneficial devisee, who stands in the place of the heir. And the reason for the distinction is, that the bond is no charge upon the land; which, however, being assets in the hands of the heir or devisee, the tacking the bond to the mortgage is allowed against him, merely to prevent a circuity of suits, and from no other consideration whatever.
The first branch of the doctrine of tacking, also embraces the case of a mortgagee invested with the legal title, who makes further advances to the mortgagor, upon the credit of the land mortgaged. If future advances be provided for by the mortgage itself, then a subsequent incumbrancer must take subject to that provision of the contract; as much so as in regard to the primary debt, even though the mortgagee have notice of the subsequent incumbrance. The same consequence will follow from a written agreement between the mortgagor and mortgagee, subsequent to the mortgage, by which fur *300 ther advances are made upon the credit of the same security; provided, as regards a mesne incumbrance, the advances have been made without notice thereof. So, though there be no express agreement, yet if a further sum be lent by the mortgagee upon a statute or judgment, inasmuch as that gives a general lien on the land, it shall t>e intended to be upon the same security.
The second branch of the doctrine allows a bona fide mesne incumbrance to be squeezed out by a junior mortgagee, who has laid out his money without notice of the mesne incumbrance ; and this is effected by the contrivance of purchasing in a prior incumbrance and uniting it to his own. As in the case of three successive mortgages, or of a first and second judgment and then a mortgage; the last incumbrancer by mortgage, if he had no notice of the mesne incumbrance at the time of taking ,his own, may purchase in the first, and so obtain priority for both.
r This whole doctrine of tacking, unless in the case of further advances originally provided for by contract, is extremely harsh and unreasonable. Natural justice obviously requires that valid incumbrances should be paid according to. their priority ip point of time. The first incumbrance is an appropriation of the property, by the consent of the owner, or the operation of law, to the satisfaction of a just demand; and so a second incumbrance is an appropriation, in like manner, of what shall remain after satisfaction of the first. The same is true in regard to every successive incumbrance ; and there is no more reason for placing a third incumbrancer over the head of the second, than for placing the second over the head of the first. The first incumbrancer who, after a second incumbrance, enlarges his demand beyond the effect of his original contract, is in truth as regards the second, only a third incumbrancer j and a third incumbrancer is nothing more as regards his original demand, though he purchases in the first incumbrance.
*301 The doctrine is justified by no one, upon the principies of natural justice, and rests for its support upon artifieial reasoning. It was introduced and is sustained upon the ground, that the mortgagee entitled to its benefit has the advantage of the legal title, and has equal equity, and therefore the law shall prevail.' Marsh v. Lee, 2 Vent. 337: Brace v. Dutchess of Marlborough, 2 P. Wms. 491; Worthy v. Birkhead, 2 Ves. R. 571. But the assumed equality of equity is not well founded; 4 Kent’s Comm. 178; 1 Story’s Equ. 399. There is no colour for it, except in the idea that each claimant is a bona fide purchaser for a valuable consideration; but that does not produce equality in point of right. He whose incumbrance is thus overreached is prior in point of time, and at least equal in equity; and therefore should have the benefit of the maxim, Qui prior est in tempore portion est in jure.
The elements of the doctrine, it will be seen, are the possession by the preferred mortgagee of the legal title,, and the pre-existence or accession of a distinct equity, without notice of the me$ne incumbrance. Hence it is obvious, that it could never have been introduced into a country enjoying the benefits of a general registry, intended to give notice to the whole world of all conveyances and incumbrances, and to supply the place of actual notice. In' England, a general registration law has never existed—a defect in her jurisprudence which has occasioned much inconvenience and litigation, and many difficulties in the adjudication of conflicting equities. It is true they have partial registration laws, applicable only to the county of Middlesex, (exclusive of London,) parts of the county of York, and the town of Kingston upon Hull; and these seem to have been intended to make the registry notice to all persons, and to dispense with the necessity of parol proof of notice : and such was the opinion of a great Judge, Lord Hardwicke, in Hine v. Dodd, 2 Atk. 275; an opinion, however, which has not *302 prevailed; and the contrary doctrine is now well established.
The English Courts seem to have construed these partial registration laws in connection with the rules of equity in regard to constructive notice. The statutes provide that memorials of deeds shall be registered in offices established for the purpose, and that unless so registered they shall be adjudged fraudulent and void, against subsequent purchasers or mortgagees for a valuable consideration. But they do not provide what shall be their effect when registered; and it is held that they give no more efficacy to those that are registered than they had before, and consequently that the registration is not notice to a subsequent purchaser or mortgagee. This interpretation is founded, in a great measure, upon the supposed mischievous consequences of regarding the registry as constructive notice; for then it would have to be taken as notice of every thing contained in the memorial, and to be notice though the deed be not duly registered. Bushell v. Bushell, 1 Sch. & Lef. 103 ; La-touche v. Dunsany, Id. 157. These consequences might have been avoided by holding the registry, when duly made, and to the extent of the information which it gives, to have been intended by the Legislature to stand in place of actual notice. And this in effect is the construction which has been given to the Irish registration act of 6 Anne, ch. 2, which is a general law for the whole of that country; (but is different in its terms from the English statutes;) for it has been held that it gives preference to instruments affecting,lands, both at law and in equity, according to the priority of registration. Bushell v. Bushell, supra; Eyre v. Dolphin, 2 Ball & Beat. 299.
To my mind, it is difficult to conceive a system of general registration, introduced for the purpose of giving information to purchasers and incumbrancers in regard to the true state of the title, in which the Legislature *303 could contemplate their being at liberty to neglect the safe and certain means thus provided, and deny having resorted to them; and so put a prior purchaser or incumbrancer upon parol proof of actual notice, or actual search of the registry. In nearly all the States of this Union, the registry is held to be notice to subsequent purchasers and mortgagees, provided the deed has been duly proved or acknowledged. 4 Kent’s Comm. 174; 1 Story’s Equ. 392; Johnson v. Stagg, 2 Johns. 11. 523. And this concurrent construction of the registration laws of various States, is believed to be founded as much upon the general scope and policy of such laws, as the particular provisions of the statutes.
In Virginia, prior to the revisal of 1819, our registration acts will be found embodied in the act of 1792, regulating conveyances. Old Rev. Code, p. 156, 157. The provisions of which bearing on this subject are contained in the 1st and 4th sections, which must be construed together. It will be seen that they are not copied from the English local registration laws, and that although in most respects substantially the same, they are not identically so. In the 1st section there is a modification of the general provision which has an important bearing in weighing the terms of the statute. The language employed is, “nor shall any such conveyance be good against a purchaser for valuable consideration, not having notice thereof, or any creditor, unless” &c. The notice he rereferred to of course means actual notice. Now, what is the obvious meaning of the provision so modified ? Is it not that though a subsequent purchaser have no actual notice of the deed, yet if it be acknowledged or proved and lodged with the clerk to be recorded according to the provisions of the act, it “ shall be good against him ?”
The interpretation of the act of 1792, was presented to the consideration of this Court in the case of Doswell v. Buchanan’s ex’ors, 3 Leigh 365. The question there *304 was as to the effect of the registration of a deed conveying an equitable title only; but the three Judges who sat in the cause expressed their views upon the operation of the statute generally. Judges Carr and Green, conforming to the English authorities, were of opinion that though the statute requires deeds to be recorded, and makes them void as to subsequent purchasers without notice if not recorded; yet that the recordation is not notice to subsequent purchasers, and gives them no additional effect. Judge Cabell’s opinion, on the contrary, was that the English authorities were not applicable, and that the true policy, spirit and meaning of our statute was to make the registry notice to subsequent purchasers. In consequence of this division of the Court, the construction of the act of 1792 is still unsettled.
But now by the revised act of 1819, 1 Rev. Code, p. 362, 365, there is an express provision, giving effect and validity to all duly registered deeds against subsequent purchasers, though for a valuable consideration and without notice; and a further provision that the regular registration of title bonds, and other written contracts in relation to land, shall be taken and held as notice to all subsequent purchasers of the existence of such bond or contract.
It is easy to perceive that the operation of the registry laws of Virginia, and of other States of the Union, is to cut- up by the roots the English doctrine of tacking, so far as it affects intermediate purchasers and incumbrancers. 4 Kent’s Comm. 178; 1 Story’s Equ. 405, n. 2; 1 Lomax’s Dig. 390; 2 Rob. Prac. 68. Such is the effect of the Irish registry act, and the reason (equally applicable to the registry laws of this country) is thus lucidly and forcibly stated by Lord Redesdale: “The meaning and intention of the act was to secure persons taking charges upon estates—to provide that they should have that to resort to which would enable them to take *305 with more security. Now tacking does tend most strongly to prevent purchasers (in which description mortgagees are included) from being so secured, because by its operation all intermediate incumbrancers are to be prejudiced: they cannot be secured, unless the effect of the act be to require all instruments affecting the estate to be brought by proper memorials upon the registry. The provisions of the act seem intended to enable a person dealing with the estate to say, ‘ all instruments that can have effect against me are brought on the registry, and none which are not there can be brought against me.’ This necessarily excludes tacking; for that is giving effect to an instrument which a person is not enabled by means of the registry to discover; and the manner in which the act is framed shews that such was the idea of the Legislature.” Latouche v. Dunsany, 1 Sch. & Lef. 159.
If this were not so, still the doctrine of tacking would avail the plaintiffs nothing; for they have not presented a case falling within its principles. The doctrine is purely artificial, and as remarked by Lord Ilardwicke, in Wortley v. Birkhead, 2 Ves. R. 573, could not prevail in any other jurisprudence than the English, by which the jurisdiction of law and equity is administered in different Courts, and creates different kinds of rights in estates. It is based upon the supposed advantage gained by him who holds the legal title, and is not applicable where that advantage does not exist. It cannot be enjoyed by one who has not obtained the legal title, or the better right to call for it. In all cases where the legal title is outstanding, the several incumbrances must be paid according to their priorities in point of time; and therefore in Brace v. The Dutchess of Marlborough, 2 P. Wms. 491, it was held that a puisne incumbrancer who has bought in a prior mortgage, in order to tack it to his puisne incumbrance, cannot do so where there is a still prior mortgage. 1 Story’s Equ. 405; Coote on *306 Mortg. 507. Nor will even the possession of the legal title enable an incumbrancer to tack, where he does not hold it in his own right, but in autre droit, as trustee for another. Coote on Mortg. 497; Morret v. Paske, 2 Atk. 52. Tacking takes place only where the party holds both securities in the same right. 1 Story’s Equ. 404; 2 Covt. Pow. Mortg. by Rand, 559; Barnet v. Weston, 12 Ves. R. 130. And a regularly executed mortgage cannot be enlarged by tacking subsequent advances to it, in consequence of any agreement by parol. Ex parte Harper, 19 Ves. R. 477.
In the case before us, Kennerly, under whom the plaintiffs claim, is not a mortgagee of the legal title, but only of the equity of redemption incident to the prior mortgage executed to the defendants Byers & Butler, &c. Nor did Kennerly obtain the legal title by the conveyance to him of the 3d of March 1831; which conveyance, moreover, was made to him not in his own right, but in his character of trustee. And the agreement, if any be proved, under which the plaintiffs seek to tack further advances by Kennerly, rests altogether in parol. In addition to all this, it is not pretended in the bill that the further advances were made upon the credit of Kennerly's mortgage, or without notice of Mrs. M’Clanachan's mortgage.
In every point of view, therefore, the claim of the plaintiffs, so far as it rests upon the doctrine of tacking, is utterly without foundation. Indeed, that ground is but faintly presented in the bill, and has not been urged in the argument; and I would have said very little on the subject, but for the light which the discussion of it serves to throw upon the other grounds on which the plaintiffs insist that they have a priority of lien; and which I will now proceed to consider.
Independently of Kennerly’s mortgage, the plaintiffs in their bill assert a lien upon the lands in question, and seek to subject them in the character of incumbrancers, *307 for debts not secured by that mortgage. This they attempt to do by force of the deed of the 3d of March 1831, executed to Kennerly, upon the trusts already mentioned; connected with an allegation that the deed was made with an intent and for purposes different from those apparent upon the face of the instrument.
The bill, after setting forth Gantt's promissory note to Maginnis for 150 dollars, made the 23d of August 1830, and payable the 10th of March 1831, and endorsed to Kennerly ; represents “ that the said John Gantt being thus indebted to the said George II. Kennerly, and having in addition thereto a large and rapidly accumulating account in the store of said Kennerly, none of which he was prepared to discharge; with his wife, the aforesaid Virginia A., executed to the said Kennerly another deed of the 3d of March 1831.” It then describes the property and the trusts declared by the deed, and proceeds thus: “ But your orators are informed, and so allege, that the true design was to create a fund for the payment of the debt of 150 dollars aforesaid, and the other debts which were then so accumulating in the hands and on the books of said Kennerly. They charge that at the time the said deed was executed, it was expressly understood that upon the sale of said land, or any part thereof, the proceeds were to be applied to the payment of the aforesaid debts, and any other which said Kennerly might have upon said Gantt. They are informed, and so charge, that the accounts of said Gantt upon the books of said Kennerly commenced on the 1st day of January 1831, and terminated on the 24th day of March 1832, and the unsettled amount thereof on that day, was 3524 dollars 44 cents, all of which remains due ; and they are further informed, and so charge, that upon the credit of the fund to be raised by the sales of the lands mentioned in said deed, the whole of said account was contracted.” The bill then sets forth the negotiable note of Gantt and Blackwell, made the *308 5th of June 1831, and payable six months thereafter to Kennerly; and by him endorsed to Maginnis, and charges “ that said note was given for that amount of goods furnished, to be used in the mountain trade up the Missouri river, upon the express condition that the payment thereof should be secured out of the proceeds of the land conveyed as aforesaid.” And in another part of the bill, it speaks of the deed to Kennerly as a second mortgage, and the fund thereby provided as a mortgage fund, out of which it was designed and understood, at the time the above mentioned debts to Kennerly were contracted, that they should be paid.
It will thus be seen that this is an attempt to convert by parol, a trust for the benefit of the grantors into a mortgage for the benefit of the trustee. If such evidence be admissible against subsequent purchasers and incumbrancers, without notice of the alleged parol agreement or understanding, then, it seems to me, there can be but little efficacy in the statute against frauds and perjuries, or in our registration laws.
•There is no principle more elementary, both at law and in equity, than that which excludes parol evidence offered to explain, enlarge, or vary the terms of a deed or other written contract. This rule of evidence has, by operation of the statute of frauds, become in relation to real estate, a canon of property. It has in some cases been broken in upon by the Courts of Equity, from considerations arising out of fraud, accident, mistake, or breach of confidence. These considerations have led, amongst other instances, to relief against absolute deeds intended by the parties to operate as mortgages. But no such considerations arise in the case before us; and it would be difficult, I think, to find an example where a party to a deed, with a full knowledge of its legal import and effect, has been permitted to shift a declared trust in favour of the grantor, or any other person, so as to make himself the cestui que trust, instead of the trus *309 tee. However this may be, between the parties themselves, it is surely inadmissible against bona fide purchasers and. incumbrancers, having no other notice than the contents of the instrument itself.
Our law, unquestionably in its present state, avoids deeds and conveyances, if unregistered, to the prejudice of subsequent purchasers and incumbrancers in good faith; and when duly registered, makes them effectual as notice to all the world. But the notice is of the contents of the instrument, and of nothing more; not of any secret condition, or trust, or equity, between the parties. Frost v. Beekman, 1 Johns. Ch. R. 288; 18 Johns. R. 544, S. C.; Parkit v. Alexander, 2 Johns. R. 510; St. Andrew’s Church v. Tompkins, 7 Johns. Ch. R. 14; Davison v. Waite, 2 Munf. 527; Colquhoun v. Atkinson, 6 Munf. 550; Bell v. Hammond, 2 Leigh 416. If this were otherwise, then the registry, instead of being a protection, would be a snare to others dealing with the subject. As against bona fide subsequent purchasers and incumbrancers, a registered deed or conveyance must be taken to express truly the agreement between the parties; and all extrinsic stipulations, dealings and arrangements can stand upon no better footing than an unregistered contract; and if by parol, of a contract incapable of registration. They cannot operate to the prejudice of the subsequent purchaser or incumbrancer; but may prove beneficial to him, by destroying the effect of the deed or conveyance as a registered instrument. Thus, if a deed absolute on its face, and unaccompanied by any defeasance, be intended and agreed between the parties to operate as a mortgage, it can have no effect, in either character, against a subsequent purchaser or incumbrancer, who has not actual notice of the true nature of the transaction. Day v. Dunham, 2 Johns. Ch. R. 182; 15 Johns. R. 555.
In a contest for priority between incumbrancers, the purposes of justice do not require the admission of parol *310 testimony, to vary the terms or legal effect of a registered instrument; and the necessity of resorting to it, can only arise from the negligence or want of good faith °f the party who offers it, or of those under whom he claims. There can be no better illustration of the mischiefs of such evidence than is furnished by the case before us.
It is not denied that Mrs. M’Clcmachaii is a bona fide creditor, to the full amount secured by her incumbrance. There can be no objection whatever to the consideration of the debt due to her, stated in her mortgage to be her interest in lands sold and conveyed to the mortgagors; in all probability her dower interest in the very lands in question. No notice on her part at the time of taking her incumbrance is charged in the bill, even of the existence of the deed of March 1831; much léss of the secret matters of equity relied upon by the plaintiffs; and all notice is expressly denied in her answer. That deed, as a registered' instrument, could give her no information whatever, of any agreement or understanding between the parties, that it was to operate as a mortgage in favour of the trustee; or even of any indebtedness to him, prospective or otherwise, on the part of the grantors. The instrument on its face was in no wise for the benefit of the trustee, but wholly for the convenience and benefit of the grantors, whose right under its provisions to alien or incumber the property conveyed was quite as unlimited as before its execution. If the deed had been lying before Mrs. M’Clanachan at the time she took her mortgage, it would not have furnished the slightest hint of any objection to the title she was about to acquire.
The parol evidence introduced by the plaintiffs is that of a single witness, whose testimony is remarkably loose, general and sweeping; and though I do not question the veracity of the witness, notwithstanding some discrepancies in his statements, yet it is obvious that such *311 proofs could be easily manufactured to suit the occasion, without much danger of detection. The objections, however, to the admissibility of any parol evidence upon the subject, stand out in bold relief upon the face of the bill, and require no analysis of that which has been prodliced.
Thns I think it clear that the plaintiffs cannot derive the priority asserted by them, otherwise than from the true import and legal effect of the instrument under which they claim: and these I take upon this question to be the same, whether the property be regarded as realty or personalty.
The rule of equity which treats land directed to be sold as personalty, and money directed to be invested in land as realty, was not devised for the advantage of the agent or trustee by whose agency the commutation was to have been effected; but for the advantage of the beneficiary or cestui que trust. In truth, the trustee is supposed to have no interest in the matter, and his convenience or benefit is so far from being contemplated by this fiction of equity, that the tendency of it is to restrain or defeat his power and authority over the subject. And the very reason for the rule assigned in the books is, that otherwise, it would be in the power of the trustee to make the property land or money, at his choice; and so give it to those entitled to it, in the one character or the other, at his pleasure. The effect of the rule is to give to the cestui que trust the dominion and control of the subject; to enable him to strip the trustee of his agency and revoke his authority; and to take or dispose of the property in its new character, or leave it to the disposal of the law at his own option.
It is true, an equity in favour of the trustee dehors the instrument may arise out of transactions between him and the cestui que trust. Thus if the latter should seek to bring the former to an account of his proceedings in execution of the trust, or to divest him of the *312 title, whether legal or equitable, which had been conveyed to him, without allowing him his just and proper set-offs and advancements; a Court of Equity might impose equitable conditions upon the relief sought, resujting in a kind of lien upon the subject, as between the parties. And I will not say that in the present case equity would not, upon the application of the trustee, or those claiming under him, create and enforce such a lien, as against the cestui que trust and his representatives. But the claim of the trustee assumes quite a different aspect when asserted against a bona fide purchaser or incumbrancer, who had no actual notice of the dealings of the former with the trust subject, and who could derive none from an inspection of the trust deed. In this case, the registry, if examined, would (had it then been made,) have informed Mrs. M’Clanachan of the conveyance to the trustee, for the benefit of the grantors; of the authority conferred on the trustee to make sale of the property, with the acquiescence of the grantors; and of his duty to account with them for the proceeds of the sale ; and it might further have informed her negatively of a matter notorious in itself, that no such sale had been made, and of course, that the trust remained unexecuted by the trustee. But it could have informed her of nothing more ; it could not have informed her of dealings between the trustee and cestui que trust, not provided for or contemplated by the provisions of the trust deed. Nor was she bound to make enquiry after any such dealings. There was nothing in the instrument to put her upon the enquiry, and if there had been, she was not bound to make it.
The doctrine that whatever puts a party upon enquiry amounts to notice, is inapplicable to the provisions of the statute, in regard both to registered and unregistered conveyances. The registry is not intended to put subsequent purchasers and incumbrancers upon enquiry, but to put an end to the necessity of all enquiry. It is no *313 tice in point of law to all persons of the contents, import and legal effect of the registered instrument; but not of other matters connected with the subject, not apparent upon the face of the instrument. The statute contrasts this notice in point of law of registered conveyances, with notice in point of fact of unregistered conveyances, and by fair construction, with notice in point of fact of any title or claim not disclosed by a registered instrument. The notice in point of fact must be such as to affect the conscience of the subsequent purchaser or incumbrancer. It may be either actual, in other words direct and positive, or it may be circumstantial and presumptive. But it is not sufficient if it merely puts the party upon enquiry. It must be so strong and clear as to fix upon him the imputation of mala Jides. Day v. Dunham, 2 Johns. Ch. R. 182.
The error in the argument of the appellees’ counsel is in the assumption, that the fiction of equity which converted the property in question from realty into personalty, placed it, in its new character of personalty, in the hands of the trustee Kennerly. But this assumption is, I think, without any just foundation. The property is still land, though impressed with the character of personalty; and the actual possession of it is in no wise changed. Before the deed of March 1831, it was in the possession of the grantors ; and so it is still, as regards the survivor, notwithstanding that conveyance. The deed conveyed to the trustee the title, (I mean the equitable title,) but nothing more. It is not pretended that there was any tradition of the possession to the trustee. The right to the possession until a sale should be accomplished, and to the perception of the intermediate profits, continued in the grantors. The trustee could not have evicted them by an action at law, for want of the legal title; and if he had been clothed with the legal title, a Court of Equity would have restrained him from using it for such a purpose.
*314 How then did the trustee Kennerly acquire any right to, or interest in the subject ? There is no pretence of his having claimed it as assignee or purchaser; and if he had, then a question would have arisen whether his claim in that character, the assignor or vendor still retaining the possession, would have been good against a subsequent purchaser or incumbrancer without notice. But no such question arises in this case. His claim is, as I have shewn, that of an incumbrancer by parol, for debts due to him individually, and is equally invalid whether the property be regarded as real or personal. The law requires all incumbrances by way of mortgage or trust, of personal as well as real property, to be in writing, and to be duly registered, as against subsequent purchasers or incumbrancers. There was not, nor could have been from the nature of the subject, any pawn or pledge of the property to the trustee, as there may be of chattels movable, for example a slave or a horse; a species of security which the law tolerates, because the notoriety of the possession gives notice to every one that the pawnee is either the absolute or the qualified owner. And if the subject be considered as a chose in action, there was not, nor could have been any transfer or deposit of the evidences of title. An equitable mortgage by a deposit of title deeds is a much stronger case; but since our registration laws, there can be no such security against a subsequent bona fide purchaser or incumbrancer, and we are happily rid of so pernicious a doctrine. 4 Kent’s Comm. 151; 2 Story’s Equ. 289; Sug. on Tend. 694, 5; Colquhoun v. Atkinson, 6 Munf. 550.
The result of the foregoing views, if correct, is that the Chancellor’s decree is erroneous in giving priority to the plaintiffs over Mrs. M ’ Clanachan. And it matters not how far Gantt’s indebtedness to Kennerly may have accrued before or after the deed of March 1831, or before or after Mrs. M’Clanachan’s mortgage, or before *315 or after the registration of either, or whether in the whole or in part it he called debts or advancements. It is certain, if that were material, that it did not arise out of any performance by Kennerly of his trust duties under the deed of March 1831; in regard to all which he has been wholly quiescent.
In this result there is no injustice. If Kennerly thought fit to trust Gantt upon his personal responsibility or good faith, or with the expectation that trust moneys would come to his hands, or upon any parol agreement or understanding with him that he should have a lien upon the land in question, without taking the proper steps to secure such lien ,• he and those claiming under him must bear any loss consequent upon such imprudence, and cannot be permitted to throw it upon a bona fide lawful incumbrancer, who may have been misled into dealing with the subject by the negligence of her adversary, and who has both law and equity on her side.
I do not perceive any errors in the decree besides those indicated by the views above presented. And the other objections taken to it require no consideration, after what has been said. If priority over the plaintiffs be given to Mrs. M’Clanachan, to the extent of her mortgage, she can have no remaining cause of complaint. The elder mortgagees will be satisfied by the provisions of the decree. The appellant Norborne Beall Gantt, as 1 have shewn, has no interest in the subject. And the defendant Gantt has taken no appeal.
The proper modifications of the decree, I think, will be to direct a sale of the fee simple in the whole of the lands embraced by the deed of March 1831, and Mrs. M’Clatiachan’s mortgage ; the satisfaction of the latter out of so much of the proceeds of sale as shall arise out of such of the property as is thereby conveyed; and the application, first, of the residue of the funds in the hands of the defendants North and Wilson towards the satis *316 faction of the personal decree in favour of the plaintiffs against the defendant Gantt; and next the application to the further satisfaction of that personal decree of the residue of the proceeds of such sale, so far as requisite for that purpose; and finally the payment of any still existing residue of those proceeds to the defendant Gantt.
Cabell, P. concurred in the results of Baldwin's opinion.
Stanard, J. dissented.
The decree of the Court was as follows :
The Court is of opinion, that by the deed of the 3d of March 1831, from John Gantt and Virginia A. his wife to the trustee Kennedy, the whole estate of the grantors in the lands thereby conveyed became vested in said Kennerly, upon the trusts thereby declared, that is to say, that he should sell said lands for the best price he could obtain therefor, for the use and benefit of the grantors, and convey the same to the purchaser or purchasers thereof by one or more good and sufficient deeds; that the obvious intent of said instrument was to divest the fee simple title of the feme and vest it in the trustee, in order to accomplish sales of the property, from time to time, and place the proceeds at the disposal of the grantors; that the effect thereof was, in the contemplation of a Court of Equity, to convert the property thereby conveyed from realty into personalty, and to confer it, in its new character, upon the husband and wife jointly; that the husband thereby acquired the power to alien or incumber it without the concurrence of the wife, and in the event (which has happened) of his surviving her, the whole interest, so far as undisposed of by him, became his absolute property; and that the appellant Norborne Beall Gantt, the heir at law of the *317 female grantor, has in no point of view shewn any title, legal or equitable, to the subject in controversy, or any interest therein. The Court is further of opinion, that the character of personalty having been thus impressed upon said lands, it w'as wholly unnecessary for the said Virginia A. Gantt to unite with her husband in the mortgage to the appellant Mildred M’Clanachan; that her having done so cannot affect its validity as the act of her husband; and consequently, that the objections which have been taken to the certificate by the justices of her privy examination, require no consideration. And the Court is further of opinion, that the said deed of trust of the 3d of March 1831, to the trustee Kennerly, appears upon its face to be in no wise intended for his benefit, and conferred upon him no beneficial interest whatever in the subject thereby conveyed: that the parol evidence introduced by the appellees Siler, Price Sf Co. for the purpose of proving that at the time of the execution of said deed of trust there was a parol agreement or understanding between said John Gantt and said Kennerly that the same should operate as an incumbrance in favour of said Kennerly to secure debts to him from said Gantt, whether then existing, or thereafter to be contracted, is wholly inadmissible; and that whatever equity the said Kennerly, or the said Siter, Price Sf Co. claiming under him, may have as against said Gantt to treat such debts as advancements made to him upon the credit of the trust subject, and as constituting a lien in their favour thereupon, they can have none as against the appellant M’Clanachan, the aforesaid trusts declared by said deed of the 3d of March 1831, remaining wholly unexecuted, and she appearing to be a subsequent bona fide incumbrancer, without notice, actual or by implication of any such advancements. And the Court is further of opinion, that the said Kennerly, and the said Siter, Price Sf Co. claiming under him, have no right, at least as against the said M’Clanachan, to tack to their *318 mortgage of the 13th of June 1829, the debts asserted in the bill which are not embraced in that mortgage. The Court is therefore of opinion, that though the said decree of the said Circuit Court properly directs the funds in the hands of the defendants North and Wilson, arising out of the sales of portions of the property embraced in the mortgage to Byers fy Butler and others, and in the said mortgage to said Kennerly of the 13th of June 1829, to be applied, so far as requisite, to the satisfaction of the balances due upon those mortgages, in the order by said decree prescribed; yet that said decree ought not to have given priority to the plaintiffs over said M’’ Clanachan for the other debts claimed by the plaintiffs under said Kennerly, in regard to the property embraced in her mortgage; but ought to have given her priority of satisfaction out of the property conveyed by that mortgage: and that, instead of the sales directed by said decree, a sale ought to have been directed of the fee simple in' the whole of the lands embraced by the deed of the 3d of March 1831, and said M’Clanachan1 s mortgage; and the satisfaction of the latter out of so much of the proceeds of sale as should arise out of the property thereby conveyed; and the application, first, of the residue of the aforesaid funds in the hands of the defendants North and Wilson, after the discharge of the balances due upon the two first mortgages, towards the satisfaction of the personal decree in favour of the plaintiffs against the defendant Gantt; and.next the application to the further satisfaction of 'that personafdecree, of the residue of the proceeds of such sale, so far as requisite for that purpose ; and finally, the payment of any still existing residue of those proceeds to the defendant Gantt. Wherefore it is adjudged, ordered and decreed, that so much of the said decree of said Circuit Court as is in conflict with the foregoing opinion, be reversed and annulled, and that the residue of said decree be affirmed, with costs to the *319 appellants against the appellees Siter, Price & Co., and this cause is remanded to the said Circuit Superior Court to be there further proceeded in, in conformity with the principles of the foregoing opinion and decree.